IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-02174-PAB-MDB

ARLEEN AGUIRRE,

    Plaintiff,

v.

PUEBLO SCHOOL DISTRICT NO. 60,

    Defendant.

_____

**ORDER**
_____

This matter is before the Court on defendant's Partial Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6). Docket No. 21. Plaintiff filed a response opposing defendant's motion, Docket No. 31, and defendant filed a reply. Docket No. 32. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

**I. BACKGROUND[1]**

Plaintiff Arlene Aguirre, a Latinx woman, taught Spanish at Central High School ("Central") for approximately eleven years. Docket No. 20 at 2, 12, ¶¶ 8, 55. Defendant Pueblo School District No. 60 ("the District") is a public school district.[2] *Id.* at 2, ¶ 5. Until the end of the 2019-2020 school year, Central offered students in-person

_____

[1] The following facts are taken from plaintiff's Second Amended Complaint and Jury Demand, Docket No. 20, and are assumed to be true for purposes of this order. *See Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

[2] Plaintiff's complaint refers to "the District" without stating that the District refers to Pueblo School District No. 60 or that Central High School is part of Pueblo School District No. 60. *See* Docket No. 20 at 2, ¶ 8. The Court presumes that the District refers to defendant and that Central is part of the District.

instruction in Spanish, French, and Italian.  *Id.* at 5, ¶ 16.  The French and Italian teachers at Central are "Anglo."[3]  *Id.* at 8, ¶ 29.  At the beginning of the 2019-2020 school year, 135 students elected to enroll in Spanish, 98 enrolled in Italian, and 73 enrolled in French.  *Id.* at 5, ¶ 16.  Central serves a predominantly Hispanic population. *Id.* at 5, ¶ 15.

Teachers at Central are evaluated based on Quality Standards.  *Id.* at 3, ¶ 10. Central's principal Destin Mehess became plaintiff's evaluator in 2015 and provided her annual ratings for each Quality Standard.  *Id.*  In the 2015-2016 and 2017-2018 school years, plaintiff received "Accomplished" ratings for two Quality Standards.  *Id.*  In the 2016-2017 school year, plaintiff received one rating of "Accomplished" and one rating of "Exemplary," which is the highest rating on the Quality Standards.  *Id.*  In the 2018-2019 school year, plaintiff received "Proficient" and "Partially Proficient" ratings for the same Quality Standards.  *Id.* at 3-4, ¶ 10.

Before plaintiff received her annual rating for the 2018-2019 school year, she sent several emails to principal Mehess and other District administrators attempting to curb "racially motivated, hostile attitudes and actions at Central."  *Id.* at 4, ¶ 11.  On May 2, 2018, plaintiff emailed Principal Mehess to report actions by one of Central's assistant principals.  *Id.*  On November 6, 2018, plaintiff emailed Principal Mehess and other District administrators about another incident with the same assistant principal.  *Id.*  On January 28, 2019, plaintiff emailed Principal Mehess to report that, at a school wide assembly, a student master of ceremonies used the term "Greaser," which is offensive

---

[3] Plaintiff does not define "Anglo," but indicates that it is a race distinct from her own. Docket No. 31 at 13.  The Court presumes she refers to Anglo-Saxon or White.

and derogatory to Latino people.  *Id.*  Principal Mehess and the other administrators that were emailed failed to take action to address plaintiff's concerns.  *Id.*, ¶ 12.

After plaintiff received her 2018-2019 evaluation, she filed a grievance challenging the lower ratings she received.  *Id.* at 5, ¶ 13.  The District agreed to amend plaintiff's evaluation to raise both challenged ratings to Accomplished.  *Id.*, ¶ 14.

The Pueblo Education Association ("PEA") is the exclusive representative of the District's teachers for the purpose of bargaining terms and conditions of employment. *Id.*, ¶ 17.  The PEA and the District entered into a collective bargaining agreement for the 2019-2020 school year.  *Id.,* ¶ 18.  Colo. Rev. Stat. § 22-63-101 allows a school district to invoke "displacement" under which a teacher is removed from her position at a school and must seek a position at a new school.  *Id.* at 6, ¶ 21.  Displacement can result in an indefinite unpaid leave of absence if a displaced teacher cannot find a new position.  *Id.*  PEA and the District reached an agreement that established a two-step process for the District to notify both PEA and an affected teacher of a displacement. *Id.* at 6-7, ¶ 25.  First, if the District determines that a displacement is necessary, the principal of the affected school shall issue a statement to the superintendent that shall be made available to the affected teacher and the Association [PEA] . . . .  Second, if the Superintendent agrees with the Principal's statement, the Superintendent or her designee will provide written notice of displacement to all displaced teachers."  *Id.* at 7, ¶ 25 (citations, quotations, and alterations omitted).

In or about March 2020, Principal Mehess met with Executive Director of Human Resources Eric DeCesaro to discuss Central's staffing plan for the following school year.  *Id.*, ¶ 28.  Principal Mehess proposed eliminating in-person Spanish instruction at

Central.  *Id.*  "On April 2, 2020, Principal Mehess informed Ms. Aguirre that Central would 'not be offering Spanish [in 2020-21].'"  *Id.* at 8, ¶ 30.  That same day, Principal Mehess emailed Mr. DeCesaro and other District administrators, excluding the superintendent, "to let them know she had informed Ms. Aguirre that she was being displaced and that someone from the Human Resources department would be in touch."  *Id.*  Mr. DeCesaro prepared a formal letter notifying plaintiff of her displacement.  *Id.*, ¶ 31.  Before April 2, 2020, neither PEA nor plaintiff was given notice of a contemplated displacement at Central.  *Id.*, ¶ 32.

PEA filed a grievance alleging violations of the collective bargaining agreement including that plaintiff's displacement was a disguised disciplinary action and that Central did not provide proper notice of plaintiff's displacement.  *Id.* at 8-9, ¶ 34.  The human resources director for the District issued a final internal "Level 2" decision denying the grievance.  *Id.* at 9, ¶ 35.  The decision ruled that plaintiff was not subject to disguised discipline and that the notice that was given complied with the collective bargaining agreement.  *Id.*  The collective bargaining agreement allows PEA to request arbitration if it disagrees with a Level 2 decision.  *Id.*, ¶ 36.  The results of arbitration are advisory unless PEA and the Board[4] agree that the results are binding.  *Id.*

PEA made a demand for arbitration on the decision on its grievance.  *Id.*, ¶ 37.  PEA and the Board did not agree to a binding arbitration result.  *Id.*, ¶ 36.  On November 6, 2020, an arbitration hearing was held, and on December 1, 2020 the arbitrator issued

---

[4] Plaintiff repeatedly refers to "the Board" in her complaint without defining the term. *See* Docket No. 20 at 9, 10, 12, ¶¶ 36, 41-43, 60-63.  Plaintiff's response to defendant's motion defines the Board as the District's Board of Education.  Docket No. 31 at 1.  The Court will use this definition of the Board.

his decision recommending that the Board deny PEA's grievance.  *Id.*, ¶¶ 38-39.  The issues considered in the decision were "a) whether Mehess complied with the notice requirements of the CBA, . . . b) whether Aguirre's displacement was a disguised disciplinary action; and c) whether the failure to provide Aguirre with a consent hire position in another school in the District was a disguised disciplinary action."  *Id.*, ¶ 40.  The decision did not consider whether plaintiff's displacement was an appropriate decision as a matter of educational policy.  *Id.*

On December 8, 2020, the Board accepted the abitrator's decision.  *Id.* at 10, ¶ 41.  The Board did not serve plaintiff with a notice of displacement.  *Id.*, ¶ 42.  A city councilperson for Pueblo, Ray Aguilera, ran into a Board member, Barbara Clementi, and expressed his opposition to the elimination of the Spanish program at Central.  *Id.*, ¶ 43.  Clementi told Aguilera that Spanish may be reinstated at Central with another teacher.  *Id.*

As a result of her displacement, plaintiff was placed in a one-year position in the District at South High School.  *Id.*, ¶ 45.  Plaintiff interviewed for a permanent position at South High School and was not selected.  *Id.*, ¶ 46.  Plaintiff was then placed on indefinite unpaid leave by the District.  *Id.*, ¶ 47.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be

plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with his allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)). Otherwise, the court need not accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

### III.  ANALYSIS

On August 10, 2021, plaintiff filed suit against the District.  Docket No. 1.  The operative complaint brings claims of retaliation and race based discrimination in violation of 42 U.S.C. §§ 2000e-3(a), 2000e-2(a)(1) ("Title VII"), breach of contract, and *ultra vires* termination in violation of Colo. Rev. Stat. § 22-32-109.  Docket No. 20 at 11-13, ¶¶ 49-64.  Defendant filed a motion under Fed. R. Civ. P. 12(b)(6) to dismiss plaintiff's first and second claims under Title VII and plaintiff's fourth claim of *ultra vires* termination.  Docket No. 21.  Plaintiff filed a response opposing the District's motion.  Docket No. 31.  The District filed a reply.  Docket No. 32.

### A.  Retaliation

Aguirre's first claim alleges that the District, specifically Principal Mehess, displaced plaintiff in retaliation for her opposition to racial discrimination at Central.  Docket No. 20 at 11, ¶¶ 50-52.  Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin."  *See* 42 U.S.C. § 2000e-2(a)(1).  Such claims can be demonstrated either by "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic" or by "using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [(1973)]."  *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015).

To state a prima facie case of retaliation, a plaintiff must allege that she (1) engaged in protected opposition to discrimination, (2) suffered an adverse action that a reasonable employee would have found material, and (3) "a causal connection exists

between the protected activity and the materially adverse action." *Barrington v. United Airlines Inc.*, 566 F. Supp. 3d 1102, 1112 (D. Colo. 2021) (quoting *Nealis v. CoxCom, LLC*, 731 F. App'x 787, 790 (10th Cir. 2018) (unpublished)).  In other words, plaintiff "must establish that retaliation played a part in the [adverse] employment decision." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008).

The parties agree that plaintiff's alleged protected activities are the three emails she sent to Principal Mehess and other District administrators on May 2, 2018, November 6, 2018, and January 28, 2019.  Docket No. 20 at 4, ¶ 11; Docket No. 21 at 7; Docket No. 31 at 4, ¶ 5.  The parties agree that plaintiff alleges that her displacement on April 2, 2020 is a materially adverse action.  Docket No. 20 at 8, ¶ 30; Docket No. 21 at 7; Docket No. 31 at 11.  The Court assumes that plaintiff plausibly alleged these elements. The District, however, argues that plaintiff cannot establish the third element of a prima facie case of retaliation, a causal connection between plaintiff's emails expressing concern about racism and her displacement.  Docket No. 21 at 6.

To establish the third element of a prima facie case of retaliation, a plaintiff must show that a "causal connection exists between the protected activity and the materially adverse action." *See Barrington*, 566 F. Supp. 3d at 1112.  "To establish a causal connection, a plaintiff must present 'evidence of circumstances that justify an inference of retaliatory motive.'" *Duda v. Elder*, No. 18-cv-02890-RBJ, 2020 WL 6290383, at *8 (D. Colo. Oct. 27, 2020), *aff'd*, 7 F.4th 899 (10th Cir. 2021) (quoting *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014)).  "Temporal proximity – when the protected conduct is closely followed by the adverse action – is often the basis for inferring a causal connection." *Id.* (citing *Ward*, 772 F.3d at 1203).

"A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). As the District notes, *see* Docket No. 21 at 7, the Tenth Circuit has found far shorter periods too long to establish the causal link element by temporal proximity alone. *See, e.g.*, *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) ("[A] three-month gap between protected activity and an adverse action is too long to support an inference of causation on its own."); *see also Tiger v. Powell*, No. 21-cv-01892-PAB-SKC, 2022 WL 4182413, at *11 (D. Colo. Sept. 13, 2022) (collecting cases). Longer periods may suffice in "unique circumstances," such as when a plaintiff is on leave for most of the time between the protected activity and the personnel action. *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1217 (10th Cir. 2003). The court in *Wells* noted that "[t]he reason that a five-month gap generally does not in itself suffice to establish causation is that anger or resentment–the motivation for possible retaliation–is an emotion that tends to diminish with time." *Id.* "When retaliation for an act occurs well after the act, one wonders why the retaliator failed to act sooner." *Id.* In *Wells*, because the plaintiff was on leave, the court noted that, even if the supervisor "had a desire to retaliate for the November complaints, it did not make sense for him to do so until [p]laintiff returned to work." *Id.* Thus, the court held that the plaintiff had established sufficient temporal proximity to show causal connection. *Id.* No similar fact exists in this case. Given the year-long gap between the protected activity and plaintiff's displacement, there is no inference of a retaliatory motive.

Plaintiff argues that she can show causation with the following evidence of pretext. Docket No. 31 at 11-13. First, plaintiff says that the performance reviews Principal

Mehess gave Aguirre for the 2018-2019 school year were revised upward showing that the less favorable evaluations were pretextual. *Id*. at 11. Second, plaintiff argues that she can show pretext by showing that similarly situated employees were treated more favorably. *Id*. at 11-12. Third, plaintiff claims that Clementi's comment to Aguilera that the Spanish program may be reinstated adds to the plausibility of plaintiff's claim. *Id*. at 12. Finally, plaintiff argues that she can show pretext with disturbing procedural irregularities in her displacement. *Id*. at 12-13. Plaintiff states that the procedural irregularities indicate Principal Mehess anticipated opposition from Central's largely Hispanic community for eliminating the Spanish program. *Id*. at 12. The Court will address each argument in turn.

Plaintiff is generally correct that, in cases like this one, where too much time has passed between the protected activity and the personnel action to establish a causal connection based on temporal proximity alone, "the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *See Anderson*, 181 F.3d at 1179 (considering pretext to show causal connection where protected activity and an adverse action were separated by two months and one week). However, the Tenth Circuit has cautioned that, although "pretext evidence can be considered when assessing whether the employee has established a prima facie case when that evidence indeed gives rise to an inference of actionable discriminatory intent," *Nealis*, 731 F. App'x at 791 n.2 (citing *Wells*, 325 F.3d at 1218), "plaintiffs must still produce sufficient probative evidence to establish their prima facie case." *Id*. (citing *Barlow v. C.R. Eng. Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) ("If the plaintiff does not establish a prima facie case, [her] entire case fails.")). "[C]ourts must not conflate evidence tending

10

to cast doubt on the employer's stated reasons for an employment decision with the plaintiff's prima facie burden of establishing an inference of retaliation in the first instance." *Id.* (citing *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008) (holding that plaintiffs may not "gain the benefit of [an] inference [of retaliatory intent] without having to establish it," and a plaintiff hoping to prove her prima facie case by attacking the employer's reason for her termination must still show "a demonstrable nexus between aspersions cast on an employer's stated reasons and invidious intent")).  Courts applying these admonitions have held that a plaintiff must allege that the protected activity was a "but-for cause of the adverse employment action."  *See Bekkem*, 915 F.3d at 1271 (citing *Ward*, 772 F.3d at 1203; *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

Plaintiff's evidence of pretext, however, fails to link her protected activity to her displacement.  In plaintiff's first example of pretext, she claims that the fact her reviews were adjusted upwards after her grievance demonstrates that her reviews were not justified, but plaintiff also states that the less favorable evaluation she received is not a part of the adverse action she challenges, arguing instead it provides evidence of Principal Mehess' retaliatory motive.  Docket No. 31 at 11.  Plaintiff argues that changing attitudes and treatment of an employee can create evidence of causation.  *Id.* If so, plaintiff has not explained why that is true here.  Other than the bare fact that the ratings were revised upward as a result of the grievance, the complaint provides no allegations regarding why the original ratings were discriminatory or unsupported and why or how the grievance process led to a non-discriminatory or unbiased rating.

Moreover, the complaint does not explain why the original ratings, across all categories, reflect any discrimination by Principal Mehess and why, a year later, that motive carried over to the alleged acts of retaliation. *See Bekkem*, 915 F.3d at 1272 (ruling plaintiff's lack of evidence that her supervisor was "motivated by the same anger" two years after expressing a discriminatory motive without evidence was only speculation).

Next, plaintiff argues that the school's decision not to remove the French and Italian programs is evidence of pretext. Docket No. 31 at 12. Plaintiff alleges that the French and Italian teachers are Anglo and that Spanish had higher enrollment than French and Italian for the 2019-2020 school year. Docket No. 20 at 5, 8, ¶¶ 16, 29. Plaintiff argues that Spanish being cancelled despite having higher enrollment and similarly situated teachers shows that plaintiff's displacement was pretextual. Docket No. 31 at 12. Individuals are considered "similarly situated" for purposes of Title VII "when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and" when comparing disciplinary action an employer takes against the employees that they "have engaged in conduct of 'comparable seriousness.'" *EEOC v. PVNF, L.L.C.,* 487 F.3d 790, 801 (10th Cir. 2007) (quoting *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006)); *see Deuth v. Martin Marietta Materials, Inc.,* No. 21-cv-03660-PAB-NRN, 2023 WL 22187, at *7 (D. Colo. Jan. 3, 2023) (applying the similarly situated standard to instances of discipline).

The District responds that plaintiff has not alleged that the French and Italian teachers did not engage in protected conduct. Docket No 32 at 4; *see Frey v. Town of Jackson, Wyoming*, 41 F.4th 1223, 1232 (10th Cir. 2022) (ruling that, in the First Amendment context, to state a claim of retaliation a plaintiff must provide evidence of

12

the treatment of similarly situated people who were not engaged in the same speech). The Court agrees with the District that plaintiff has not indicated that the French and Italian teachers are relevant comparators to plaintiff for her claim of retaliation. Comparing Aguirre's treatment to Anglo colleagues may be useful evidence of race-based discrimination, but it does not provide evidence of a causal connection between her protected activity and her displacement without any reference to other teachers' lack of protected speech.

Aguirre argues that Clementi's comment demonstrates pretext. Docket No. 31 at 12. Plaintiff alleges that, after her displacement Clementi told another person that the Spanish program might return at Central with another teacher. Docket No. 20 at 10, ¶ 43. Plaintiff admits that the "complaint does not allege a specific connection between Clementi and Mehess other than the Board's rubber stamp of the advisory arbitration decision," but argues that the comment adds plausibility to her pretext claim. Docket No. 31 at 12. However, this comment does not suggest that plaintiff's displacement was caused by her protected activity. Plaintiff shows no evidence that Clementi knew about her protected activity and plaintiff makes no argument that a comment made after her displacement, standing alone, constitutes evidence of a causal connection.

Finally, plaintiff argues that "disturbing procedural irregularities" in her displacement show pretext and a causal connection. *Id.* Plaintiff claims that, drawing inferences from the fact that Central served a predominantly Hispanic population, Docket No. 20 at 5, 7, ¶¶ 15, 28, one could conclude Principal Mehess did not follow the required process for notice because "she anticipated [] opposition from Central's largely Hispanic community." Docket No. 31 at 12. This argument fails to link plaintiff's protected activity

13

to her displacement.  The Court agrees with the District that plaintiff fails to show any evidence that could support an inference of a causal connection between her protected activity in 2018 and 2019 and her displacement in 2020.  The Court will grant the District's motion for summary judgment on plaintiff's first claim for retaliation under Title VII.

## B.  Discrimination

Plaintiff's second claim alleges that plaintiff was displaced because of her race in violation of Title VII.  Docket No. 20 at 12, ¶¶ 55-56.  Under *McDonnell Douglas*,[5] plaintiff must first establish a *prima facie* case of race or national origin discrimination. *Kendrick v. Penske*, 220 F.3d 1220, 1226 (10th Cir. 2000).  Next, the employer must "articulate some legitimate, nondiscriminatory reason for its employment action."  *Id.*  If the employer meets this burden, the burden shifts back to the plaintiff to show that the employer's "justification is pretextual."  *Id.*  To make out a *prima facie* case of race-based disparate treatment, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) she was treated less favorably than similarly situated employees not in the protected class.  *See, e.g., Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

The District argues plaintiff cannot establish the third element of her prima facie case for her discrimination claim.  Docket No. 21 at 8-12.  Plaintiff responds that the same facts that support her retaliation claim support her discrimination claim.  Docket No. 31

---

[5]  Defendant states that the *McDonnell Douglas* burden shifting framework applies to plaintiff's Title VII discrimination claim, *see* Docket No. 21 at 8-9, and plaintiff agrees. Docket No. 31 at 13.  The Court will therefore decline to analyze plaintiff's claim for evidence of direct discrimination.

at 13.  Plaintiff specifies that she alleges that the French and Italian teachers are Anglo and that Spanish was eliminated despite having higher enrollment than French and Italian for the 2019-2020 school year.  Docket No. 20 at 5, 8, ¶¶ 16, 29; Docket No. 31 at 13.  As discussed above, plaintiff's claim that her Anglo co-workers were not displaced does not establish evidence of retaliation for her protected activity, but the analysis is different for her claim of discrimination because plaintiff must only present evidence of discrimination on the basis of race, not her protected activity.

Defendant argues plaintiff has not alleged that the French and Italian teachers are similarly situated because plaintiff provides "no facts about the teachers' positions." Docket No. 21 at 10.  The cases the District cites in support of this proposition are distinguishable.  *Id.*  In *New v. Bd. of Cnty. Comm'rs. for Tulsa Cty.*, 434 F. Supp. 3d 1219, 1224-25 (N.D. Okla. 2020), the court ruled plaintiff had not shown gender-based discrimination where plaintiff compared herself to other employees without specifying that the other employees were male and only presented evidence she was discriminated against after complaining of inappropriate sexual behavior and not because of her gender.  In *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404-05 (10th Cir. 1997), plaintiff could not establish at the summary judgment phase that he faced ancestry-based discrimination based on denied requests for leave where he did not specify the ancestry of his comparators and compared his specific request for vacation to unspecific requests for time off.  The court ruled that plaintiff's evidence was not specific enough to show discrimination.  *Id.*  At the motion to dismiss stage, a "complaint raising a claim of discrimination does not need to conclusively establish a prima facie case of discrimination, but . . .  a plaintiff must include enough context and detail to link

the allegedly adverse employment action to a discriminatory or retaliatory motive with something besides 'sheer speculation.'" *Bekkem*, 915 F.3d at 1274-75 (quoting *Khalik*, 671 F.3d 1194).  Here, plaintiff does not merely allege that other employees were treated better without identifying their race.  Instead, she identifies two Anglo employees who taught a foreign language to a similar, albeit smaller, number of students at the same school who were treated differently.  These facts are enough to plausibly allege plaintiff was similarly situated to the French and Italian teachers.

The District argues that, even if Aguirre and the Italian and French teachers are similarly situated, speculation is not enough to support an inference of discrimination. Docket No. 21 at 10-11.  The Tenth Circuit has ruled that a plaintiff had not alleged enough facts to support a claim of discrimination beyond sheer speculation where she raised "no allegations of similarly situated employees who were treated differently" and "[t]here [wa]s no nexus between the person(s) to whom she complained and the person who fired her." *Khalik*, 671 F.3d at 1194.  Plaintiff, however, does not rely on speculation that she was treated differently.  She identifies that Spanish had a higher enrollment than French or Italian.  Docket No. 20 at 5, ¶ 16.  Aguirre identifies Principal Mehess as the decisionmaker for staffing Central and for eliminating in-person Spanish instruction. *Id.* at 7, ¶ 28.  At the pleading stage, this is sufficient to allege that similarly situated employees were treated differently by Principal Mehess in the staffing decision for the 2020-2021 school year at Central.  The Court will deny the District's motion to

dismiss plaintiff's claim of discrimination based on a failure to plausibly allege circumstances that give rise to an inference of discrimination.[6]

### C.  Ultra Vires Termination

Plaintiff's fourth claim for relief alleges that, "under Colorado law, the decision to displace Aguirre, and put her on indefinite unpaid leave, was *ultra vires*." *Id.* at 13, ¶ 64. Plaintiff alleges the decision to displace plaintiff was made in violation of Colo. Rev. Stat. § 22-32-109(1)(f)(I), which defines a specific duty of the Board of Education. Docket No. 20 at 12, ¶ 60.  One of the duties of the Board of Education is "[t]o employ all personnel required to maintain the operations and carry out the educational program of the district and to fix and order paid their compensation."  Colo. Rev. Stat. § 22-32-109(1)(f)(I).  The Colorado Supreme Court has ruled that a school board may delegate "functions which are ministerial or administrative in nature," but may not delegate "legislative or judicial powers involving judgment and discretion . . . which have been vested by statute . . . unless such [delegation] has been expressly authorized by the legislature."  *Big Sandy Sch. Dist. No. 100-J, Elbert Cty. v. Carroll*, 433 P.2d 325, 328 (Colo. 1967), *overruled on other grounds, Normandy Ests. Metro. Recreation Dist. v. Normandy Ests., Ltd.*, 553 P.2d 386, 389 (Colo. 1976).

Section 22-32-109 has been interpreted to prohibit a school board from delegating the decision to employ or discharge teachers.  *Lazuk v. Sch. Dist. No. 1, City & Cty. of Denver*, 22 P.3d 548, 552 (Colo. App. 2000) (citing *Big Sandy*, 433 P.2d at 326).  The

---

 [6]  As the Court finds plaintiff's claim plausibly alleges discrimination based on disparate treatment of similarly situated employees, the Court need not address defendant's arguments that plaintiff's other evidence of discrimination is implausible. *See* Docket No. 21 at 11-12.

statute has also been interpreted to allow a school board to delegate the power to dismiss a school bus driver, to transfer principals to teacher positions, and to transfer teachers between schools.  *Id.* (citing *Fremont Re-1 Sch. Dist. v. Jacobs*, 737 P.2d 816, 820 (Colo. 1987) (school bus drivers), and *Wheeler v. Sch. Dist. No. 20*, 535 P.2d 206, 209 (Colo. 1975) (principals)).

In *Lazuk*, the Colorado Court of Appeals ruled that the decision to transfer a teacher to a new school was administrative and properly delegated because it did not function as a policy-making decision given that Colo. Rev. Stat. § 22-63-206(1) limited the superintendent's discretion to transfer a teacher to instances when "the teacher is 'qualified by virtue of academic preparation and certification and if, during the current school year, the amount of salary of such teacher is not reduced' . . . .  [The statute] also prohibits discriminatory transfers."  22 P.3d at 552 (quoting Colo. Rev. Stat. § 22-63-206(1)).  Moreover, the Colorado Supreme Court ruled that the power to reassign a principal to a teaching position was not an improper delegation of duty because the discretion of a superintendent to reassign a teacher from an executive or administrative position to a teaching position was limited by statute.  *Wheeler*, 535 P.2d at 209 (citing Colo. Rev. Stat. § 22-63-114(2)).

The District argues that Colo. Rev. Stat. § 22-32-109(1)(f)(I) does not apply to plaintiff because she was displaced, not terminated, and displacement is authorized by a different statute, namely, Colo. Rev. Stat. § 22-63-202(2)(c.5).  Docket No. 21 at 13.  Section 22-63-202 provides, in part:

> The general assembly finds that, for the fair evaluation of a principal based on the demonstrated effectiveness of his or her teachers, the principal needs the ability to select teachers who have demonstrated effectiveness and have demonstrated qualifications and teaching

> experience that support the instructional practices of his or her school. Therefore, each employment contract executed pursuant to this section shall contain a provision stating that a teacher may be assigned to a particular school only with the consent of the hiring principal.

Colo. Rev. Stat. § 22-63-202(2)(c.5)(I).  The statute further specifies that it applies to "any teacher who is displaced as a result of drop in enrollment; turnaround; phase-out; reduction in program; or reduction in building, including closure, consolidation, or reconstitution."  *Id.*, § 22-63-202(2)(c.5)(VII).  "Any active nonprobationary teacher who was deemed effective during the prior school year and has not secured a mutual consent placement shall be a member of a priority hiring pool" and, "[i]f a nonprobationary teacher is unable to secure a mutual consent assignment at a school of the school district after twelve months or two hiring cycles, whichever period is longer, the school district shall place the teacher on unpaid leave until such time as the teacher is able to secure an assignment."  *Id.*, § 22-63-202(2)(c.5)(III)(A), (IV).  Plaintiff argues that displacement has a more serious impact on policy-making decisions than transfer and that, because displacement is the first step towards unpaid leave, the Court should consider it to be like hiring and firing and distinct from transferring a teacher.  Docket No. 31 at 14-15.

The Court agrees with the District that plaintiff fails to identify a limitation on the District's ability to displace plaintiff.  The key tenet of plaintiff's *ultra vires* claims is that displacement is tantamount to termination.  Docket No. 20 at 12, ¶ 63.  The Court disagrees.  Not only is displacement not strictly a termination, even if it may lead to unpaid leave in some circumstances, but Section 22-63-202(2)(c.5)(IV), which discusses displacements, states that if a displaced teacher

19

goes a year with no offers, the school board "shall place the teacher on unpaid leave." *Id*. Thus, the aspect of displacements that plaintiff finds analogous to terminations is expressly authorized by the General Assembly. Moreover, Section 22-63-202(2)(c.5) has other provisions that limit the school board's discretion regarding displacements. The statute limits discretion on the reasons a teacher may be displaced and establishes the displacement procedure, in ways similar to the way that Section 22-63-206(1) was found to limit discretion in *Lazuk* and Section 22-63-114(2) was found to limit discretion in *Wheeler*. The Court agrees with the District that plaintiff cannot establish a violation of Section 22-32-109 based on the decision to displace plaintiff. The Court will grant the District's motion to dismiss plaintiff's fourth claim of *ultra vires* termination.

### IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant's Partial Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) [Docket No. 21] is **GRANTED in part** and **DENIED in part**. It is further

**ORDERED** that plaintiff's first and fourth claims are **DISMISSED with prejudice**.[7] It is further

---

[7] Defendant's partial motion for summary judgment seeks dismissal of plaintiff's first and fourth claims. Docket No. 42 at 1. Because those claims are now dismissed, defendant's motion for summary judgment is moot. To the extent the motion requests "attorney's fees," Docket No. 42 at 20, the Court will deny that request as unsupported and for failure to comply with D.C.COLO.LCivR 54.3(a), which requires that a request for attorney fees be "supported by affidavit."

**ORDERED** that Defendant's Partial Motion for Summary Judgment [Docket No. 42] is **DENIED as moot**.

DATED March 8, 2023.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

21